J. ROBERT WALLER ET AL. v. SIDONIA HOSFORD ET AL.,
Appellants.

**Trusts:** REMOVAL OF TRUSTEES: POWER OF COURT: EVIDENCE. The removal of trustees is largely a discretionary power of the court, to be exercised with due regard to the best interests of the beneficiaries. And where it is sought to remove trustees appointed by will or deed this power will be sparingly invoked and only

when clearly necessary to save the trust property; mere error of judgment or breach of trust may not be sufficient, but there should be such misconduct as to show want of capacity or fidelity, thus placing the estate in jeopardy.

In this action the evidence is reviewed and held sufficient to justify the removal of two testamentary trustees but not sufficient to require the removal of a third trustee.

*Appeal from Dubuque District Court.*—HON. M. C. MATTHEWS, Judge.

TUESDAY, MAY 2, 1911.

ACTION to compel defendants as trustees to report, to remove them, and for the appointment of other trustees in their stead. On hearing, defendants were removed and other trustees appointed. They appeal.—*Modified* and *remanded.*

*S. B. Letner,* for appellants.

*Hurd, Lenehan & Kiesel,* for appellees.

LADD, J.—Richard Waller died testate December 31, 1888, leaving surviving him three children, Robert Waller, Mary E. Kemler, and Sidonia Hosford. Another son, Simon Waller, died some time previous, leaving a son, J. Robert Waller, and a daughter, Sidonia M. Cholbin. Decedent devised and bequeathed all his property of whatever kind to his three children as trustees. After providing that his debts, funeral expenses, and certain legacies be paid, and the distribution of his household effects, the will declared all property remaining a trust fund to be managed as follows:

I direct that upon my death said trustees make and return to my friend Charles H. Eighmey a full and complete inventory of such property and themselves take possession of the real estate and lease the same to such per-

sons on such time and for such rents as they or the majority of them may think proper and collect and pay over the rent arising therefrom to my said friend Charles H. Eighmey. And I direct my said trustees to place in the keeping of my said friend Charles H. Eighmey all moneys, notes, bonds, securities, and other evidences of property; and from time to time collect and pay over to him all the interest, dividends, and profits arising therefrom as soon as received, and I hereby empower said trustees to collect, sell or exchange any of the trust funds, real or personal, and to execute all proper receipts and conveyances therefor, but all moneys or other property derived from the collections, sales or exchange of any of the trust fund shall be and remain a part of said trust fund, and shall be reinvested by said trustees as soon as possible; and all moneys and other properties that shall be received for rents, interest, dividends and profits derived from the trust fund shall constitute and be known as the income fund and shall be disposed of as herein provided. I hereby nominate and appoint my said friend Charles H. Eighmey the custodian of both the trust fund and the income fund herein provided for and exempt him from the necessity of giving any bond or other security for his trust; I herein provide and direct that so long as either my son Robert Waller, my daughter Mary A. Kemler or my daughter Sidonia Hosford shall live my said trustees and their successors in office shall continue to collect the rents, interest, income and dividends arising from the trust property and promptly pay over the same to said custodian or his successor in office and I hereby direct that at the expiration of each and every three months after my death that said custodian or his successor in office shall distribute said income fund then in his hands as follows: To my son Robert Waller the one-fourth part thereof, to my daughter Mary A. Kemler the one-fourth part thereof, to my daughter Sidonia Hosford the one-fourth part thereof, and to my grandchildren James Robert Waller and Sidonia Cholbin, children of my deceased son Simon Waller the other fourth part thereof to be divided equally between them.

The custodian was to retain $100 per year as his compensation and the trustees nothing, but they were to be

repaid from the trust fund by the custodian for moneys necessarily paid out and expended by them. In event of the death, resignation, refusal, or inability to act of any trustee, the remaining trustees were authorized to appoint a trustee in his stead, who might be allowed the compensation paid the custodian. Mrs. Kemler and Mrs. Hosford were authorized to appoint attorneys in fact to transact the business of the trust in their stead. In event of the death of a beneficiary, the share of the income which would have gone to him was to be distributed to his descendants, and, upon the death of the survivor of the trustees named in the will, the estate was to be distributed to the descendants of his four children, those of each child receiving one-fourth thereof. Other conditions were added by codicil not involved herein, save that any debts of children or of those of his son Simon might be deducted by the custodian from their respective shares of the income fund and any debts of grandchildren shall be paid from their share of the trust fund. Though a special administrator was appointed, the trustees designated appear to have assumed the performance of their duties at once. No formal inventory was filed with the custodian, though a book containing a list of the bills receivable appears to have been furnished him as was also a list of the real estate. From these it appeared that decedent left in cash $2,004.19, bills receivable $306,871.60, and real estate valued at $38,285. There is a discrepancy in the cash item, for the books disclose that the cash on hand was $6,276.74. This does not indicate any indirection on the part of the trustees, for they acknowledge the latter amount, and it is charged to them in their accounts. On October 24, 1889, Mrs. Hosford designated her husband, A. W. Hosford, attorney in fact to act in her stead, and Mrs. Kemler appointed her husband, A. W. Kemler, who had looked after the affairs of decedent for many years prior to his death, and the two attorneys in fact appear to have managed the estate until

Kemler's death January 20, 1895. Robert Waller did not participate therein, nor did the attorney in fact designated by him November 29, 1893; such appointment being unauthorized by the will. Mrs. Kemler named no one to succeed her husband as attorney until March, 1899, when she appointed her son and daughter, R. W. and J. E. Kemler to act in her stead. Robert Waller died September 23, 1899, and on May 1st following Mrs. Hosford and Mrs. Kemler appointed Frank B. Hoffman to succeed him as trustee. A. W. Hosford resigned as attorney in fact January 10, 1902, and on the same day Slocum was appointed in his stead, but after two or three months resigned, since which time Mrs. Hosford has had no attorney in fact to act for her. This action was begun January 21, 1903, demanding an accounting, the removal of the trustees, and the appointment of others in their stead. Plaintiffs are the children of Simon and Robert Waller, and as such are entitled to one-half of the income from the estate, and on distribution will be entitled to a like proportion of the trust fund. Subsequently one of them, Mary A. Twaits, died, and George Twaits, as executor of her estate, was submitted as party plaintiff. Their interests are such that they may well insist upon such an efficient management of the estate that it will yield a reasonable income and also conserve the property for the uses intended.

Whether a trustee shall be removed and another appointed in his stead is largely within the discretion of the court. Perry, Trusts, section 275 et seq.; Godefrois, Trusts, 637; Beach, Trusts, section 386. The test always is the best interest of the beneficiaries. The power to remove trustees appointed by will or deed is exercised sparingly by the courts and to justify such a course there must appear the clear necessity to save the trust property. In *Waterman v. Alden,* 144 Ill. 90 (32 N. E. 972), the trustees failed to keep proper accounts. One of them gave little or no attention to the business, and they

were shown to have been negligent in failing to promptly collect claims owing the estate. The court, after referring to the broad jurisdiction of a court of equity over trust estates and trustees, said the court would "remove trustees for a failure, through neglect or from wilfulness, to perform their duties, or will compel them to carry out the trust which they have been appointed to and have accepted as shall appear under the circumstances of a given case, for the best interest of the estate and all parties interested in the same," quoted Story on Equity Jurisprudence, section 1289, as follows: "It is not, indeed, every mistake or neglect of duty or inaccuracy of conduct of trustees which will induce courts of equity to adopt such a course (remove the trustees). But the act or omission must be such as to endanger the trust property, or to show a want of honesty or a want of proper capacity to execute the duties, or want of reasonable fidelity;" and concluded "that the chancellor was justified on the whole record in refusing to remove them." In *Murdoch v. Elliott,* 77 Conn. 247 (58 Atl. 718), the keeping of books by the trustees was "decidedly unbusinesslike and exceeding careless," but this had been remedied, and, though there was a clear breach of duty in making a loan to one of their number, the court approved refusal to remove them. In *Massey v. Stout,* 4 Del. Ch. 274, it was said: "The court will not remove a trustee for error or misjudgment in some special transactions or even for a breach of trust. There must be such gross negligence or misconduct as to evidence a want, either of capacity or fidelity, putting the trust in jeopardy. Without his, the remedy for a breach of trust is to charge the trustee for the consequences of his acts, or he may be enjoined from any improper act meditated but not yet executed. . . . Wilful misconduct or some gross default are features appearing in all cases I have met with of removals for breach of trust." It is not "every mistake or neglect of duty or inaccuracy of con-

duct of trustees which will induce courts of equity to adopt such a course. But the acts or omission must be such as to endanger the trust property or to show a want of honesty or a want of capacity to execute the duties, or a want of reasonable fidelity." *Lathrop v. Smalley,* 23 N. J. Eq. 192; *Williams v. Nicol,* 47 Ark. 254 (1 S. W. 243); *In re Wrightson,* 1 Ch. (1908) 789; *Preston v. Wilcox,* 38 Mich. 578. The rule is concisely stated in 1 Perry on Trusts (6th Ed.) section 276: "The power of removal of trustees appointed by deed or will ought to be sparingly exercised by the court. There must be a clear necessity for interference to save the trust property. Mere error or even breach of trust may not be sufficient. There must be such misconduct as to show want of capacity or of fidelity, putting the trust in jeopardy." It seems that, if a trustee fails to discharge his duties from an honest mistake or a mere misunderstanding of them or from a misjudgment of them, it is no ground for removal, unless such failure shows a want of the proper capacity to execute the duties.

The record before us should be examined with these rules in mind. That the estate has not been well managed must be conceded. At the beginning there were but eleven tracts of real estate valued at $38,285. Some were disposed of and others acquired in satisfaction of loans made until it now has forty-six tracts valued at $141,452.99. Bills receivable have decreased from $306,871.60 to $122,996.02, so that there has been a diminution of assets in the sum of $82,711.78. But in the meantime $111,047.08 have been withdrawn from the trust fund for the payment of expenses, for repairs, taxes, insurance, and other items (including that extracted by Hosford), as hereinafter explained. The diminution in the estate has not much exceeded the amount paid out for legitimate expenses, and must have been within the testator's contemplation in directing all expenses to be paid from the trust fund. Up to

January, 1906, there had been distributed to the beneficiaries $299,674. Owing to the continued encroachment on the trust fund and the change from bills receivable to real estate, the income has decreased largely. Some of the loans were undoubtedly improvident. The properties on which securities were taken to secure twelve of them made before October 1, 1889, have been acquired since, but this is said to be attributable to the panic of 1893. None in satisfaction of which property has been acquired appear to have been made in bad faith, though the loans made by the trustees to themselves were inexcusable. All save those made to Mrs. Hosford and to A. W. Hosford, her attorney in fact, have been repaid and without loss. Though there were irregularities prior to the death of A. W. Kemler, these do not appear to have resulted in loss to the estate. The attorneys in fact agreed to allow the custodian $100 per year from the income fund in excess of that authorized by the will, and, contrary to the terms of the will, paid themselves from the income fund $150 apiece for services. But those items were entered on the books, and no objection appears to have been interposed thereto by those interested prior to the commencement of their action. Such payments were continued thereafter. After Kemler's death in 1895 until the appointment of R. W. and J. E. Kemler as attorneys in fact by Mrs. Kemler, in 1899, A. W. Hosford seems to have been in complete control, though R. W. and J. E. Kemler rendered services to the estate continually, and Hosford was not much interfered with by them prior to his resignation. After the retirement of Hosford, the Kemlers managed the estate. The only charge of bad faith relates to the management of Hosford. Shortly after Kemler's death, he began appropriating the moneys of the estate to his own use, and these peculations continued until his resignation. These amounted to $700 in 1895, $200 in 1896, $900 in 1898, $4,929.91 in 1899, $7,086.35 in 1900, and $10,155.37 in 1901. The items were credited

by him in a private cashbook to which the other trustees were denied access on account of services rendered. But he must have been aware that the will forbade allowance therefor, as he acted over five years without compensation other than $150 per year agreed·upon, and the money was taken without the knowledge of the other trustees or any one interested in the estate. Moreover, he paid interest on several of the items evidently to make it appear that the loan on which collected was still outstanding. Instead of paying rents, principal and interest, over to the custodian as received, and receiving from the custodian moneys expended on repairs, taxes, insurance and the like, and as exacted by the will, these were kept until the end of the three months, and then paid over less the expenses and what he appropriated, and this avoided a detail record of each loan by the custodian, as evidently was intended by the testator as a check on the trustees, and concealed his misappropriations from the custodian as well as the Kemlers. He arranged with borrowers who had made partial payments to deal with him only and in various ways not necessary to detail succeeded in shielding his conduct from detection. He made many improvident loans, several to himself, his son, and one to a firm of which his son was partner, a few days before his resignation, amounting to $9,800 now in judgment, and which under the terms of the will may be deducted from the son's portion of the estate on distribution. This is also secured by an assignment of another grandchild's share in the estate; but these loans were made without the knowledge of the trustees or the Kemlers, though they discovered them subsequently. It is not claimed that Hoffman or the Kemlers participated in any manner in the wrongdoing of Hosford. The theory of plaintiff is that they should have known, and that, in view of the circumstances, the fact that they did not know and that by taking a more active part in the management of the affairs of the estate they did not prevent misappro-

priation of the funds is proof of incapacity sufficient to exact their removal and the appointment of more competent persons to manage the estate. There were numerous incidents calculated to arouse the suspicions of the Kemlers, among which were the making of loans by Hosford without consulting them, objections by him to J. E. Kemler notifying delinquents to make payment, and the keeping of a private cashbook in which he made entries concerning estate matters.

Moreover, they might well have insisted on participating in the management of the estate that no loans be made without the approval of all the trustees, that moneys be paid to the custodians when received and have kept complete books and compared their accounts with those of the custodian. But it is easy to prescribe how a defalcation might have been avoided after it has occurred. The estate was large, and Hosford was their uncle and years their senior, had managed the estate for a long time, and was reputed a man of business integrity. Persons of ordinary sagacity in like situations might have been misled, and we are not prepared to denounce R. W. and J. E. Kemler as incapable of efficient management if aided by competent associates because of not having been better detectives. They might have kept their books better; they could have insisted on a more systematic management of the affairs of the estate; they ought not to have participated in every transaction; but this record casts no doubt on their integrity, and their fidelity to the interests of the estate has been demonstrated by long service untainted by suspicion of corruption. What they have done has been done well, and, as already intimated, the fault has been in regarding others as reliable as themselves. Moreover, the hearing in this case was in 1906, four years after Hosford's resignation, and the decree was not entered until 1910, and, if they were inefficient, ample opportunity, aside from the mere failure to detect Hosford's indirection,

was afforded. We are of opinion that the record was not such as to warrant the removal of Mrs. Kemler because of inefficiency of her attorneys in fact. Nor should she at this late day for inattention from 1895 to 1899, as her children who had attained their majority were then acting for her. The record, however, is not as favorable to the other trustees. Upon the death of Robert Waller, the surviving trustees appointed Frank B. Hoffman a trustee in his stead. He has done nothing except sign his name to satisfaction pieces upon the payment of the mortgages. He has not been consulted save upon matters of which he knew, the same as any one else might be spoken to. Mrs. Hosford testified: "I don't think he has to do a thing save sign these papers. That is all he was to do, and that is all he has ever done." He had been a partner of Hosford and was a partner of R. W. Kemler at the time of the hearing. That he has proceeded on the theory that he had no active duties to perform and no responsibility to bear is apparent, and we are of opinion that the discretion of the court was not abused in substituting another person as trustee in his stead at the instance of the beneficiaries whose interests he was designated to represent in the care of the estate.

Nor are we inclined to interfere with the order removing Mrs. Hosford as trustee. The estate has her note for $1,000 to which she claims to have a defense. The story of the misappropriations of her attorney in fact need not be repeated. Her son is indebted to the estate on two notes amounting to $1,650 and interest, a judgment of $3,142, and another note of $9,800 and interest. Since the resignation of Slocum as attorney in fact, she has not appointed another, and has not given the management of the estate the slightest attention. Though her integrity is not questioned, her situation might involve conflicting interests. As she has practically abandoned the trust by inaction, it can not be said that the trial court abused its discretion in substi-

tuting another trustee. Undoubtedly the accounting in this case has been of value to the estate. It has demonstrated to those interested that vigilance is essential in the care and conservation of trust property if adequate returns are long to be derived from its use or it is to be preserved in value for final distribution. As all expenses are to be met from the trust fund, gradual diminution thereof as well as in the income is to be anticipated, but unnecessary acceleration should be avoided by careful and stimulating management ι to which the combined judgment of three active trustees if systematically executed would seem to be equal. One-half of the costs of this court and also of the district court will be taxed to plaintiffs and the other half to defendants except Frank B. Hoffman, against whom no costs are taxed. The cause will be remanded to the district court for an entry in harmony with this opinion.—*Modified* and *remanded.*